AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

SEP **1 6** 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                      DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Motorola, Model: XT1680 Moto G5 Plus )
Serial No. 351858085291561 (IMEI) )
)

Case No. **19MJ3988**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841, 846, 952, 960 and 963 | Possession with Intent to Distribute Controlled Substance, Conspiracy to Possess with Intent to Distribute Controlled Substance, Importation of a Controlled Substance, and Conspiracy to Import a Controlled Substance. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Vincenzo Zoni, SA, Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __9/16/19__

*Judge's signature*

City and state:  San Diego, CA

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Vincenzo L. Zoni, Special Agent ("SA"), Homeland Security Investigations ("HSI"), after being duly sworn, state:

**INTRODUCTION**

1.    I make this affidavit in support of an application for a warrant to search the following smartphone, as further described in Attachment A, namely:

> a.    Motorola, Model: XT1680 Moto G5 Plus
> Serial No. 351858085291561 (IMEI)
> (**Target Device**);

The **Target Device** was seized from Jose Arturo LUNA-Quinonez on or about July 20, 2019 under FP&F Number 2019-2504-001860-01, pursuant to his arrest for importing cocaine and is currently in the possession of Customs and Border Protection (CBP), Otay Mesa Vault, at 9495 Customshouse Plaza, San Diego, California 92154.

2.    I seek authority to search the **Target Device** for evidence of illegal activity, described more fully in Attachment B (incorporated herein by reference), from April 20, 2019 up to and including July 20, 2019 of violations of 21 U.S.C. §§ 841, 846, 952, 960, and 963.

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth every fact that others or I have learned during the course of this investigation. Dates, times and amounts are approximate.

4.    The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this

1

1  investigation, but only contains those facts believed to be necessary to establish
2  probable cause.

### EXPERIENCE AND TRAINING

4      5.      I am currently a Special Agent with the United States Department of
5  Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland
6  Security Investigations ("HSI") formerly known as the ICE Office of Investigations
7  ("ICE-OI"). I have been employed by ICE OI / HSI as a Special Agent since the agency
8  was first created on March 1, 2003. From 2002 to 2003, I was a Special Agent with a
9  predecessor agency, the Immigration and Naturalization Service. Prior to becoming a
10  Special Agent, I served as Border Patrol Agent with the United States Border Patrol,
11  from 1995 to 2002.

12      6.      As a Special Agent for HSI, I am responsible for investigating laws
13  enumerated in Title 8, Title 18, and Title 21 of the United States Code. Included in my
14  responsibilities is the investigation of illicit contraband-smuggling, including narcotics-
15  smuggling, across the United States border.

16      7.      I have completed the USBP Basic Training Course at the Federal Law
17  Enforcement Training Center located in Glynco, Georgia, as well as other follow-up
18  courses required by ICE.

19      8.      Since June of 2016, I have been assigned to the HSI Special Agent in
20  Charge - Investigative Services Group as a liaison between HSI and the United States
21  Attorney's Office for the Southern District of California.

22      9.      Prior to my current assignment, I was assigned to the Deputy Special Agent
23  in Charge San Ysidro, located in San Ysidro, California. My specific assignment was
24  to the Narcotics Response Group. During my tenure, my duties included investigating
25  the illicit trafficking of controlled substances into the United States. During my
26  assignment to the Narcotics Response Group, I participated in the investigation of
27  various drug-trafficking organizations involved in the acquisition, importation,
28  transportation, and distribution of controlled substances into and through the Southern

1   District of California. Because the nature of my ongoing work requires me to keep
2   apprised of recent trends and developments involved in the investigations of drug
3   traffickers, I regularly communicate with agents from the Drug Enforcement
4   Administration, Customs and Border Protection ("CBP"), and other local and state law
5   enforcement officers operating within the Southern District of California.

6          10.   I am a Federal Law Enforcement Officer within the meaning of Rule 41(b)
7   of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the
8   enforcement of the criminal laws of the United States, and thereby authorized to request
9   issuance of federal search and seizure warrants.   I am empowered to conduct
10  investigations of, and to make arrests for, federal offenses. I have been cross-designated
11  by the Drug Enforcement Administration ("DEA") to conduct investigations and make
12  arrests based on violations of Title 21 of the United States Code.

13         11.   As an HSI SA, my primary duties include the investigation of narcotics-
14  related violations of Title 21 of the United States Code.  I investigate violations of the
15  United States Code, including drug trafficking offenses, that stem from the International
16  border between Mexico and the United States.  I have participated in investigating
17  various drug trafficking organizations that are involved in the acquisition, importation,
18  transportation, and distribution of controlled substances into and through the Southern
19  District of California.  I have spoken with other agents with extensive experience in
20  narcotics trafficking investigations.

21         12.   I have arrested or participated in the arrest of numerous persons for
22  violations of the Controlled Substances Act. In these cases, I have conducted interviews
23  with the arrested persons and their associates, as well as cooperating individuals and
24  informants.   I have conducted surveillance of narcotics traffickers while operating
25  inside the United States.  I have executed search warrants on cellular phones used by
26  narcotics traffickers in furtherance of their trafficking activities.   Through these
27  investigative activities, I have gained a working knowledge and insight into the typical
28  activity of narcotics traffickers, and the structure of their narcotics trafficking networks.

1  I also have gained information as to the normal operational habits of persons who make
2  their living as narcotics traffickers.

3         13.    Through the course of my training, investigations, and conversations with
4  other law enforcement personnel, I am aware that it is a common practice for drug
5  smugglers to work in concert with other individuals and to do so by utilizing cellular
6  telephones, pagers and portable radios to maintain communications with co-
7  conspirators in order to further their criminal activities.  Conspiracies involved in the
8  smuggling and trafficking of drugs generate many types of evidence including, but not
9  limited to, cellular phone-related evidence such as voicemail messages referring to the
10 arrangements of travel and payment, names, photographs, text messaging (via SMS or
11 other applications), and phone numbers of co-conspirators.  For example, load drivers
12 smuggling controlled substances across the border typically are in telephonic contact
13 with co-conspirators immediately prior to and following the crossing of the load vehicle,
14 at which time they receive instructions on how to cross and where and when to deliver
15 the controlled substance.  I also know that narcotics traffickers often use fraudulent
16 information to subscribe to communication facilities, especially cellular telephones, and
17 frequently change communications facilities to thwart law enforcement efforts to
18 intercept their communications.

19        14.    In preparing this affidavit, I have conferred with other agents and law
20 enforcement personnel who are experienced in the area of narcotics investigations, and
21 the opinions stated below are shared by them.  Further, I have personal knowledge of
22 the following facts, or have had them related to me by persons mentioned in this
23 affidavit.

24        15.    Based upon my training and experience and consultations with law
25 enforcement officers experienced in narcotics smuggling investigations, and all the
26 facts and opinions set forth in this affidavit, I submit the following:

27        a.     Drug smugglers and traffickers will use cellular/mobile telephones because
28               they are mobile and they have instant access to telephone calls, text, web,

4

voice messages and social media apps such as Facebook, Facebook Messenger, SnapChat, or WhatsApp.

b.   Drug smugglers and traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c.   Drug smugglers, drug traffickers, and their accomplices will use cellular/mobile telephones because they easily may arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d.   Drug smugglers and traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.   Drug smugglers and traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.   Drug smugglers, drug traffickers, and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.   "SIM" (subscriber identify module or subscriber identification module) or memory cards store identification and contact information of subscribers. They may be transferrable between different cellular/mobile telephones. Drug smugglers, drug traffickers, and their co-conspirators will replace the SIM (memory) cards in their cellular or mobile phones as a means to avoid detection.

h.   Drug smugglers, drug traffickers and their co-conspirators believe that cellular/mobile telephones provide greater insulation and protection against court-ordered wiretaps because they can frequently change phones and/or numbers, and obtain pre-paid "burner" phones without providing their

5

1             identifying information.

2          16.    Based upon my training and experience, consultations with law
3 enforcement officers experienced in narcotics smuggling investigations, and all the
4 facts and opinions set forth in this affidavit, I know that cellular/mobile telephones and
5 SIM cards can and often do contain electronic records, phone logs and contacts, voice
6 and text communications, and data such as emails, text messages, chats and chat logs
7 from various third-party applications, photographs, audio files, videos, and location
8 data. This information can be stored within disks, memory cards, deleted data, remnant
9 data, slack space, and temporary or permanent files contained on or in the
10 cellular/mobile telephones.

11          17.    Furthermore, based on my training and experience, and conversations
12 with other law enforcement officers who investigate drug smuggling and trafficking, I
13 know that drug conspiracies often require detailed and intricate planning to
14 successfully evade detection. Consequently, drug conspiracies often involve planning
15 and coordination for several months—this planning often occurs through mobile
16 telephones. Additionally, based on my training and experience, and conversations with
17 other law enforcement officers who investigate drug smuggling and trafficking, I know
18 that coconspirators are often unaware when a fellow coconspirator has been arrested
19 and will attempt to communicate with that coconspirator via mobile telephone after his
20 or her arrest to determine the whereabouts of drugs that are being transported.

21
22                       **FACTS SUPPORTING PROBABLE CAUSE**
23

24          18.    According to reports prepared by CBP officers, on July 20, 2019 at about
25 11:19 am, Jose Arturo LUNA-Quinonez, a citizen of Mexico, applied for entry into the
26 United States from Mexico through the San Ysidro Port of Entry. LUNA-Quinonez
27 was the driver, registered owner, and sole occupant of a burgundy 2017 Nissan Versa
28 bearing a Baja California, Mexico license plate. LUNA-Quinonez told CBP Officer F.
Berrelleza he had nothing to declare and was going to Chula Vista, CA. CBP Officer

1  Berrelleza conducted an inspection of the Nissan Versa and discovered packages
2  concealed in the quarter panels of the vehicle. A CBP canine unit screened the Nissan
3  Versa and the narcotics and human detection dog alerted to the trunk and a quarter
4  panel. The Nissan Versa was x-rayed and CBP Officer C. Veizaga reviewed the x-ray
5  image and noticed anomalies in the rear passenger side quarter panel. A total of 12
6  packages, weighing 13.12 kilograms (28.92 pounds) were removed from the rear
7  passenger side quarter panel. A random package was analyzed, and its contents field-
8  tested positive for cocaine.

9      19.   According to reports, at about 2:03 pm, HSI SA Eric Velazquez and HSI
10  SA Mark Schwamberger introduced themselves to LUNA-Quinonez via agency issued
11  credentials.   SA Velazquez asked LUNA-Quinonez biographical and personal
12  questions, and at about 2:16 pm, he advised LUNA-Quinonez of his Miranda rights in
13  the Spanish language. LUNA-Quinonez said he understood his rights and said he
14  wanted to make a statement without a lawyer present. LUNA-Quinonez denied
15  knowing his Nissan Versa contained narcotics inside it.

16      20.   LUNA-Quinonez said he responded to a Facebook advertisement that
17  solicited drivers to pick up money in the United States and take the money to Mexico.
18  LUNA-Quinonez acknowledged **Target Device** contained information about the
19  Facebook advertisement and provided **Target Device's** passcode. LUNA-Quinonez
20  accessed **Target Device** and showed SA Velazquez and SA Schwamberger a Facebook
21  Messenger conversation he had with a person listed as "Brandon Lemus Gonzalez."
22  LUNA-Quinonez contacted Brandon through Facebook Messenger and learned the job
23  entailed bringing money from the United States to Mexico to deliver to money exchange
24  businesses in Tijuana, Rosarito and Ensenada. LUNA-Quinonez said Brandon worked
25  for a company called FastCash and was told no illicit activity was involved with the job.
26  This Facebook Messenger conversation between LUNA-Quinonez and Brandon was
27  dated July 11, 2019.
28  / /

7

21.     LUNA-Quinonez said he met with a "Jaime Velez," on July 20, 2019 at about 9:30 am in Tijuana for breakfast at a restaurant called Ricardo's.   LUNA-Quinonez left his Nissan Versa parked, unlocked, and with a window down at a car alarm shop called "Resser." He rode with Jaime Velez to the restaurant.   When asked about the time he arrived to Resser, LUNA-Quinonez requested access to **Target Device**. LUNA-Quinonez took control of **Target Device** and accessed the WhatsApp application.   He showed SA Velazquez a WhatsApp conversation he and Jaime Velez had and pointed to a link to Alarmas Resser in Tijuana.   LUNA-Quinonez said he arrived at this location around 7:30 am and waited for Jaime Velez, who arrived there sometime after 9:00 am.   Jaime Velez told LUNA-Quinonez details about the job. LUNA-Quinonez said he had to go to Downey, CA, pick up money, and take it to Mexico.   They returned to Resser about an hour later.   LUNA-Quinonez received $100 USD from Jaime Velez for gas and food.   LUNA-Quinonez departed the business to the port of entry and later received the Downey, CA address from Jaime Velez.   LUNA-Quinonez said he did not check to see if his Nissan Versa was tampered with.

22.     Based upon my training and experience, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics possession and distribution and/or importation of narcotics activities of LUNA-Quinonez, and other unknown persons, such as telephone numbers, made and received calls, contact names, text messages, and other digital information are stored in the memory of the **Target Device**.   For the reasons set forth above, I request permission to search the **Target Device** for items listed in Attachment B for the time period from April 20, 2019, up to and including June 20, 2019.

## METHODOLOGY

23.     It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.   Cellular/mobile

devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.   An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

24.   Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within ninety 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

26.     On July 20, 2019, during LUNA-Quinonez's post Miranda interview discussed below, **Target Device** was accessed and manually searched. **Target Device** was also subjected to a forensic search and its contents downloaded. I have not included any of the information or data from the forensic search and download that I reviewed as the basis for the probable cause for this search warrant application. Furthermore, the fact that I searched the **Target Device** has no bearing on my decision to submit an application for this search warrant.

**CONCLUSION**

27.     Based on all of the facts and circumstances described above, there is probable cause to conclude that Jose Arturo LUNA-Quinonez used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

28.     Because the **Target Device** was promptly seized during the investigation of Jose Arturo LUNA-Quinonez smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by Jose Arturo LUNA-Quinonez continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from April 20, 2019 up to and including July 20, 2019.

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

29.     WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the **Target Device** described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Vincenzo L. Zoni
Special Agent

Subscribed and sworn to before me this _16_ day of September, 2019.

_____
The Honorable William V. Gallo
United States Magistrate Judge

11

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

>    Motorola, Model: XT1680 Moto G5 Plus
>    Serial No. 351858085291561 (IMEI)
>    (**Target Device**)

**Target Device** is currently in the possession of Customs and Border Protection, Otay Mesa Vault, located at 9495 Customshouse Plaza, San Diego, California 92154 and seized as evidence.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 20, 2019 up to and including July 20, 2019:

a.     tending to identify attempts to import methamphetamine or some other controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute methamphetamine or some other controlled substance within the United States;

b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute methamphetamine or some other controlled substance within the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute methamphetamine or some other controlled substance within the United States;

d.     tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute methamphetamine or some other controlled substance within the United States, such as stash houses, load houses, or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

      f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections** 952, 960, and 963.